205 So.2d 910

LOUISVILLE AND NASHVILLE RAILROAD COMPANY

v.

Flynn D. MORRIS et al.

4 Div. 594.

Court of Appeals of Alabama.

Aug. 29, 1967.

Rehearing Denied Sept. 19, 1967.

Jas. A. Mulkey, Geneva, for appellant.

Jos. P. Hughes, Geneva, for appellees.

JOHNSON, Judge.

The Circuit Court of Geneva County, Alabama, found appellant, the L. & N. Railroad Company, guilty of negligently killing four cows with its train and damages of $600.00 were awarded to appellees. From this judgment, this appeal is made.

On December 29, 1963, Q. P. Crutchfield, an employee of the Morris Farm for twenty-seven years, and whose duty it was to look after the cows, testified that he discovered four of the eighteen cows in the southeast pasture missing. He later found three of these cows dead and the fourth suffering a broken back, necessitating his shooting it. He testified that three of the cows were found about three or four feet from the track and the fourth, a quarter of a mile west about ten or fifteen feet from the track. The witness described the terrain where the cows were killed as "having a kind of ditch" and he stated that the tracks were "a little higher than the ditch". He stated that there was a high bank "on each side" of the ditch; that the ditch was on both sides of the track; that the ditch was about "three foot" deep and about "three foot" wide; and that the embankment was "ten or fifteen" feet high. The witness stated that there was "hair and fresh blood" on the tracks. He also stated that the train passed by regularly en route to Graceville, Florida, in the evening and returned in the morning. The witness placed the value of

the cows at "about $200.00 a piece" and stated that they were mixed breed and "brood cows".

On cross-examination, Crutchfield stated that he did not see the train hit the cows and though the cows were part Braham, they were not "too wild" and that each cow weighed "between 900 and 1,000 pounds".

Mr. Flynn Morris testified that he had been in partnership in the Morris Farm with his sister-in-law since 1951 and that he went to see the cows on Monday, December 30, 1963. He described them as "very dead", stating that "they were broke up and scrubbed * * * hide mangled on them, just like they had been hit with something big" and that the tracks where the cows were found were "straight as an arrow" from the apparent point of impact to the highway crossing a quarter of a mile away. The witness testified as follows as to the value of the cows and to the area where they were killed:

"Q. Mr. Morris, in your opinion how much were these cows worth?

"A. Two hundred dollars a piece is a conservative estimate on them.

"Q. Would you describe please, the area where you found the three cows?

"A. It is a cut, the railroad is cut through a hill there and piled the dirt on each bank which makes the banks up higher than this ceiling. It is fifteen feet high. It was impossible for the cows to get out of the track at that point. They can't climb, they couldn't climb the bank because it was straight up.

"Q. Approximately how long was this cut or bank that they were in?

"A. It is about 150 or 200 yards long. Maybe a little longer.

"Q. In relation to that cut where were the cows found?

"A. They were right about the middle of it.

"Q. About the middle of it. Was there a ditch or ditches in that area?

"A. There is a ditch that drains the railroad right-of-way right on the side of the track.

"Q. About how far from the track?

"A. Three or four feet from the edge of the track to the end of the cross-ties.

"Q. About how deep was the ditch?

"A. About three feet deep.

"Q. And about how wide?

"A. About three or four feet wide."

The witness also stated that he found a horn, some hair and fresh blood on the tracks. On cross-examination, he stated as follows:

"Q. You say it would be impossible for these cows to get off that railroad right-of-way?

"A. At that point."

He also stated that he knew of no other trains using the track other than those of the L. & N. Railroad Company and that the track was owned by them.

The witness also testified that these cows were "brood cows", and were a "tool of Production in the cattle business" with an expectancy of producing calves from "twelve to fifteen years", and that the cows killed were at the "prime of production", about seven years old.

At this point, appellee amended his complaint "to show that three cows were killed and one had to be killed".

Mr. J. L. Pugh, engineer of freight train No. 32 of the L. & N. Railroad Company, testified that he had been employed by the Company for twenty-three years, nineteen years as an engineer; that he had been operating a freight train between Graceville, Florida, and Geneva, Alabama, on or about December 29, 1963, consisting of one engine, one car and a caboose; that his brakes were

in good order; that he left Graceville about 3:00 or 3:30 A. M.; and that his train did hit the cows. He stated that he was on the right side of the engine and his speed was "twenty or twenty-five" miles per hour; that "the head-light of a Mars light, that is a light that goes round and around" was burning; that he came out of a curve and saw the four cows about "200 feet" away; and that he then did as follows:

"Q. What did you do immediately upon seeing those cows:

"A. I made a fast blast of whistles, which we are supposed to do, to try to get them off the track, and I applied the application of the brakes at the same time.

\*　\*　\*　\*　\*　\*

"Q. How many cows did you strike there \* \* \* did you strike them all about the same time?

"A. We struck three of them and they came off to the South side. He has got it just about right there. And then the other one we struck it just ahead of the other cows and it caught under the engine. So, where we stopped, where you found the other cow, that is where we got out and pulled that cow out from under the engine."

The engineer stated that it was easier to stop a large train than a small one because "you have more brakes and brake shoes and heavy application, and more cars to hold back"; that a train the size of the one in question, after application of *emergency brakes*, would travel "about two or three hundred feet" before stopping.

On cross-examination, the witness testified that the train struck the cows about one-fourth mile from the highway; that he first saw the cows as the lights swung out of the curve; that lights were needed as it was about 5:30 A. M. and still dark; that you can see with the train's headlight "four or five hundred yards"; that when he first saw the cows they were running down the track away from the train; and that when he applied the brakes he also hit the whistle,

but did not apply "emergency application". He stated the following:

"Q. Not in emergency?

"A. Not in emergency, because I was trying to get them off the track.

"Q. What is the difference in applying the brakes and emergency application of the brakes?

"A. Well, when you put them in emergency you dynamite the whole train. When you have an application it is just like stopping at a red light with an automobile, you put on so much brakes to stop it, you see.

"Q. And did you ever make an emergency application?

"A. Yes, sir, when I saw \* \* \* about a hundred feet from them I made the emergency application.

"Q. How far does it take to stop a train with the emergency application?

"A. Two to three hundred feet.

\*　\*　\*　\*　\*　\*

"Q. And it takes three to four hundred with just the regular application?

"A. Yes. Understand now, we didn't have but one car and a cab.

"Q. I understand that. So, you saw those cows, you say two or three hundred feet ahead of you?

"A. No.

"Q. How far?

"A. Two hundred feet.

"Q. About two hundred feet?

"A. That is right.

"Q. So, you knew that you couldn't stop the train with the regular application of the brakes?

"A. I didn't know that. I thought the cows were going to get off the track?

"Q. Did you say just now they were in this cut?

**220**

"A. Yes, they was in the cut.

"Q. Was there any place for them to go?

"A. Yes, they could have went off the track. They had places to get off; they didn't have no place where they could get off and run. They could have got off the track.

"Q. Got off so that the train would have missed them?

"A. Yes.

"Q. Well, did they even look like they were going to get off?

"A. Well, you couldn't tell they were swaying from one side of the track to the other.

"Q. How close were you to them when you made an emergency application?

"A. About a hundred feet."

Mr. W. T. Black, fireman on the train in question, testified in substance exactly as did Mr. Pugh as to the speed of the train; the killing of the cows; and stated that when he first saw the cows from the left side of the engine they were about "a hundred or two hundred feet" away; that the brakes were working well and had been tested before leaving Graceville; and that the Mars light and bell were operating at the time of the incident. He described the engineer's actions as follows:

"Q. Tell the jury just what you did or what Mr. Pugh the engineer did, or what Mr. Weaver did when you saw those cows.

"A. Yes, sir, I can tell them exactly what happened.

"Q. All right, sir.

"A. Mr. Pugh made a service application of his brakes and seen that wasn't going to work so he throwed them into emergency, and I judge we went a hundred feet I imagine before we hit the cows, after he put them in emergency.

"Q. After he put them in emergency?

"A. Yes, sir. Might have been a little further. I didn't measure it, and couldn't tell you exactly.

"Q. Did he blow his whistle?

"A. Yes, sir. He blowed the whistle when we crossed the crossing.

"Q. Did you do everything you could to avoid hitting those cows?

"A. Yes, sir. If it had been a man it would have been all the same.

"Q. Couldn't stop.

"A. Couldn't stop. It is hard to stop one of them trains."

The witness further stated that they did not fully stop the train until they were about 300 feet beyond the three cows, dragging the fourth beneath the engine; that they had to back up to remove the fourth cow from the tracks.

■ Appellant contends that an affirmative charge should have been granted in his favor if the stock was shown to have "suddenly leaped" on the tracks. This court agrees with appellant's contention, but finds it inapplicable in this case. The uncontroverted proof shows only that the four cows were seen *already* on the tracks and running down the tracks away from the train. We thus feel that *in this context*, Carr v. Alabama Great Southern Railroad Co., 43 Ala.App. 51, 179 So.2d 328, cert. den. 278 Ala. 707, 179 So.2d 330; L. & N. R. Co. v. Holmes, 32 Ala.App. 551, 27 So.2d 878; and Kansas City, Memphis & Birmingham R. Co. v. Watson, 91 Ala. 483, 8 So. 793, do not apply.

■ It is the opinion of this court that, contrary to the contention of appellant, the burden of proof is on the railway company to negate its negligence. The Code of Alabama, 1940, Tit. 48, Sec. 173, states in part as follows:

"The provisions of § 170 of this title do not absolutely originate or come into play until an obstruction on the track is

perceived. East Tennessee, etc., R. Co. v. Bayliss, 77 Ala. 429, 54 Am.Rep. 69. But by this railroad companies are made liable for any injury to persons or stock, or other property, resulting not only from a failure to comply with the statute, but from any other negligence on the part of the company. And there may be cases where the failure to ring the bell, or blow the whistle, in order to frighten away stock in dangerous proximity to the track, would be negligence, although the animals may not have been actually on the track. East Tennessee, etc., R. Co. v. Watson, 90 Ala. 41, 7 So. 813, 814."

 In the case at bar, it was only necessary that appellee prove the death of the stock caused by the railroad. The case of Louisville & N. R. Co. v. Green, 222 Ala. 557, 133 So. 294, states in part as follows:

" * * * when injury is shown by a railroad, the plaintiff makes out a prima facie case, and * * * the burden is then shifted to the railroad to rebut or overcome said prima facie case by introducing evidence sufficient to dispute or overcome the said prima facie case of the plaintiff."

See also L. & N. R. Co. v. Holmes, supra, and Carr v. Alabama Great Southern Railroad Co., supra.

The question of whether or not the engineer exercised due skill and diligence in the stopping of the train under the existing conditions was one for the jury. The case of Louisville & Nashville Railroad Company v. Yates, 38 Ala.App. 183, 81 So.2d 620, cert. den. 263 Ala. 129, 81 So.2d 623, states in part as follow:

"The evidence presented a jury question as to whether the operators of the train were guilty of negligence under these applicable principles of law, therefore, the general affirmative charge was properly refused to defendant. After allowing all reasonable presumption in favor of the correctness of the trial court's ruling on the motion for a new trial, we conclude

there was no error in overruling the motion on the grounds that the verdict of the jury was contrary to the evidence, contrary to the law and was not sustained by the great preponderance of the evidence."

See also Central of Georgia Ry. Co. v. Gholston, 24 Ala.App. 18, 129 So. 705; Atlanta & St. A. B. Ry. Co. v. Hodges, 19 Ala.App. 42, 94 So. 252; Louisville & N. R. Co. v. Watson, 208 Ala. 319, 94 So. 551; Louisville & N. R. Co. v. King, 37 Ala.App. 182, 67 So.2d 49, cert. den. 259 Ala. 358, 67 So.2d 51; and Armstrong v. Louisville and Nashville Railroad Co., 265 Ala. 113, 90 So.2d 103.

In our opinion, the verdict of the lower court was entirely within the province of the jury and, as such, should not be disturbed by this court as there has not been a showing that this verdict was palpably against the weight of the evidence.

Therefore, this judgment is due to be and the same is hereby

Affirmed.